**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| PALM BEACH GOLF CENTER-BOCA, INC., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JOHN G. SARRIS, D.D.S., P.A.,<br><br>Defendant. | Case No. 12-CV-80178<br>Judge Kathleen M. Williams<br>Mag. Judge Hopkins |

**DEFENDANT, JOHN G. SARRIS, D.D.S., P.A.'S**
**REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION**
**FOR SUMMARY JUDGMENT ON PLAINTIFF'S SECOND AMENDED COMPLAINT**

**I.     INTRODUCTION.**

Even with the arguments advanced by Plaintiff, there is no proof that Defendant ("Sarris") violated the Telephone Consumer Protection Act, 47 U.S.C. Section 227(b)(1)(C)(the "TCPA") or that its authorized agent violated the statute.  There has been no conversion of property as defendant did not take Palm Beach's property or authorize anyone else to utilize a faxing service.  The alleged fax advertisement purportedly received by Palm Beach was undisputedly sent by Business to Business Solutions ("B2B"), a New York company, in conjunction with a Romanian company by the name of Macaw.  (*See* Pl.'s Resps. to Def.'s Statement of Material Facts, ¶¶ 10-11, 32.)[1]  And, defendant has proven through the admissible evidence that neither Sarris nor Mike Roberts, an independent contractor working at Sarris's dental practice, ever authorized or approved any such advertising. (*See* Def.'s SOMF, ¶¶ 14, 29.)

**II.    FACTUAL BACKGROUND.**

The following is not in dispute.

- Roberts, alone, communicated with individuals at B2B to create an advertisement; Dr. Sarris never spoke to anyone at B2B or Macaw and never even heard of B2B in 2005.  (Def.'s SOMF, ¶¶ 9, 13-14; Pl.'s Resps. Def.'s SOMF, ¶¶ 9, 13-14.)

- Caroline Abraham maintained a database, a "Client Table," of B2B's customers and "kept track of *all* [B2B's] clients and potential clients," including Mike Roberts, in this database.  (Def.'s SOMF, ¶ 18; Pl.'s Resps. Def.'s SOMF, ¶ 18)(emphasis added.)

- It was "the custom and practice of B2B to request a customer to okay a final ad." (*See* Def.'s SOMF, ¶ 25; Pl.'s Resps. Def.'s SOMF, ¶ 25.)

---

[1] Pl.'s Resps. to Def.'s Statement of Material Facts are hereinafter referred to as "Pl.'s Resps. Def.'s SOMF, ¶ __."  Def.'s Local Rule 56.1(a) Statement of Material Facts is hereinafter referred to as "Def.'s SOMF, ¶ __."  Pl.'s Rule 56.1(a) Statement of Additional Facts is hereinafter referred to as "Pl.'s SOAF, ¶ __."

- The "N Date" notation on the Client Table was where Abraham would record the customer approval. (Def.'s SOMF, ¶ 23; Pl.'s Resps. Def.'s SOMF, ¶ 23.) There is no "N Date" notation on Abraham's Client Table for Roberts. (*Id.*)

- Abraham's Client Table and records show B2B never sent Roberts a "second cover letter" regarding how to provide final approval of any advertisement; and, there is no documentation showing a finalized version of the alleged fax ad was ever sent to Roberts. (Def.'s SOMF, ¶ 24; Pl.'s Resps. Def.'s SOMF, ¶ 24.)

Beyond this, Plaintiff claims that material facts are in dispute by providing what it avers are "Additional Facts" but which are, actually, either summations of incomplete testimony or citations to testimony without foundation[2].

First, with regard to Plaintiff's Additional Facts Paragraphs 5-6, these statements are based upon inaccurate extractions of Caroline Abraham's testimony, provided subject to defendant's objections, in response to Plaintiff's Counsel's questions[3]. (*See* Pl.'s SOAF, ¶¶ 5-6; *see also* Pl.'s Resp. Mem. at 3, 12-13 and Pl.'s Resps. to Def.'s SOMF, ¶¶ 25-26, 28-31.) In these "Additional Facts" and elsewhere, Plaintiff claims that Defendant may have given final approval orally because Abraham mused that "very often" this was done. (*See e.g.*, D.E. 75 at 12.) But that statement is pure conjecture and not based upon *this case* where Abraham admitted "something is missing" and that B2B's custom and practice does not appear to have been followed. (D.E. 60-5, Abraham Dep., at 229:1-6.)

In fact, the page-and-a-half of Abraham's testimony (pages 227-229) upon which Plaintiff relies so heavily in its opposition is either Abraham's speculation (which is

---

[2] Defendant does not contest, for purposes of this briefing, the Plaintiff's "Additional Facts" in Paragraphs 3-4, 7-8, 10 and 12. (D.E. 78). Defendant does not contest that Robert Biggerstaff has provided a report as summarized in Plaintiff's Additional Fact Paragraph 9 but contests the veracity of those conclusions. Defendant contests and denies Plaintiff's Additional Fact Paragraph 11 based upon Exhibits S and T to Defendant's Response to Plaintiff's Motion for Class Certification; however, this issue is not presently before the court on this motion.

[3] Contemporaneously herewith, Defendant has moved to strike these portions of the deposition testimony.

2

inadmissible) or her testimony as to B2B's custom and practice—which actually *supports* Defendant's showing that it never authorized the actions of the independent contractor and cannot be found liable.

Specifically, Abraham testified as follows:

Q. *Just assuming* that tiny little confirmatory step wasn't made doesn't mean that you lack authority to send faxes on the client's behalf; is that correct?

MS. ARRANZ: Objection to form and foundation. Asked and answered.

A. I don't know. I don't know because we -- it was ***just standard practice always to send out corrective ads and always to get approval***, and we didn't necessarily get approval by fax as we requested. Sometimes these people simply told the salesmen everything was fine. That happened…

(Pl.'s SOAF, ¶ 6, citing D.E. 60-5, Abraham Dep., at 228:3-15)(emphasis added.)  In other words, the "standard practice" included *both* the sending of "corrective ads" with a second cover letter and "get[ting] approval." (*Id.*)  Abraham went on to explain:

[I]t just still doesn't make sense to me because … I just know I would have done that [send a second cover letter with a corrected ad]. I don't know why there's no second cover letter… something is missing. Something doesn't make sense.

(D.E. 60-5, Abraham Dep., at 229:1-6.)  Even when she speculated that she could have "sent the first cover letter a second time… with the corrected ad," she testified she "***never did that***." (*Id.* at 229:6-17)(emphasis added.)  She "*always* made up a new cover letter saying 'here's your corrected ad;'" "[she] never used the original letter again." (*Id.* at 229:17-20)(emphasis added.)

Second, Plaintiff attempts to claim that "Defendant contracted with B2B to send 10,000 faxed advertisements" based upon Dr. Sarris's testimony.  (Pl.'s SOAF, ¶ 1.)  But there is no "admission" as it is not based upon any foundation and is either pure speculation or requires a legal opinion.  In fact, Dr. Sarris admits—and plaintiff does not contest this—he did not even know who B2B was until this lawsuit.  (Pl.'s Resp. to Def.'s SOMF, ¶ 14; *see also* D.E. 60-3,

3

Sarris Dep., at 16:5-13, cited in Def.'s SOMF, ¶ 14.)  Sarris was aware that an "*allegation* in the complaint is that [his] office contracted with [B2B] to send out advertisements by fax" but asked if he had "ever spoken to anyone at Business to Business Solutions," Dr. Sarris stated: "No." (D.E. 60-3, Sarris Dep., at 17:3-7, 16-19; *see also* 35:22-36:1.)

Defendant also contests the "Additional Facts" by Plaintiff in Paragraphs 2 and 13. Roberts did not "contact[] Dr. Sarris regarding this sending of facsimiles" specifically with B2B and *at the time* of the alleged fax broadcasting.  (Pl.'s SOAF, ¶ 2.)  Instead, Sarris testified: that he had not heard of a company called B2B until his lawyers brought the company to his attention; that he did not know whether it was "sometime in late 2005 that [B2B] sent [his] office an unsolicited fax seeking to send out faxes;" and, that he did not know how his office first came into contact with B2B.  (D.E. 60-3, Sarris Dep., at 16:5-25, 17:8-10).  Moreover, contrary to Additional Fact Paragraph 13, Defendant did take steps to disavow and disclaim the faxes sent by B2B, inclusive of asking B2B to contact its lawyer "ASAP."  (D.E. 60-6 at 27.)

The actual, undisputed facts show that no material issue remains that would preclude summary judgment for the Defendant.

### III.    ARGUMENT.

 "Rule 56 'mandates the entry of summary judgment…against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1316 (11th Cir. 2012), citing *Celotex*, 477 U.S. at 322 and *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007)(emphasis added.)  At best, Plaintiff has come forth with a "scintilla" of evidence or conjecture and speculation, which is insufficient.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505 (1986).

### A. Plaintiff Misconstrues Defendant's Initial Arguments, Which Are That Nowhere Has Plaintiff Plead An Actionable Claim Against Defendant.

Plaintiff's arguments on pages 8-9 of its Response Memorandum miss the point. Plaintiff has not pled a viable theory of liability against Defendant. Under the theory pled—that Sarris "sent" the alleged fax advertisements—summary judgment for Defendant is proper. (D.E. 61 at 6-7.) If Plaintiff wanted to proceed against Sarris on a different theory, such as vicarious liability for the actions of an independent contractor, Plaintiff needed to specifically plead that theory given the well-established case law. (*See id.* at 7, citing *Prager v. FMS Bonds, Inc.*, Case No. 09-80775-CIV, 2010 WL 2950065, *9 (S.D. Fla. July 26, 2010) and *Goldschmidt v. Holman*, 571 So. 2d 422, 423–24 (Fla. 1990)). Nowhere does Plaintiff allege any theory of vicarious liability, and it could not do so as the deadline for amending pleadings passed over a year ago. (*See* Doc.#12.)

Given the theory of liability pled against Defendant and analyzing the uncontested facts with that theory, Sarris is entitled to summary judgment because it was not the "send[er] [of] advertising faxes" under the TCPA.

### B. Even Under Wholly New Theories Of Vicarious Liability, Never Pled, The Uncontested Evidence Shows That Defendant Did Not Actually Or Apparently Authorize Any Advertising Or Ratify Any Such Advertising.

Plaintiff claims that Defendant must have authorized the sending of fax advertisements because it did a lot of the work on the potential advertisements leading up to B2B's alleged fax advertising. (*See* D.E. 75 at 11-15.) Plaintiff also claims that a reasonable jury could conclude that Defendant approved the advertisement and authorized the faxing. (*Id.* at 12-13.) However, the evidence precludes Plaintiff from prevailing on any agency theory. Defendant never authorized the sending of the subject fax, given the third-party, independent contractor's own evidence.

5

### 1. Roberts Never Authorized Any Purported Fax Advertising, As Evinced By B2B's Own Records And Abraham's Testimony.

Initially, it is uncontested by Plaintiff that Defendant did not supervise or have control over the details of B2B's work. *See generally Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1121 (11th Cir. 2011). B2B was clearly an independent contractor as Defendant did not have "the right to control the manner and means by which the agent accomplish[ed] the work." *Id.* And, it is axiomatic that a principal is not liable for an independent contractor's torts. *See e.g.*, *Nat'l R.R. Passenger Corp. v. Rountree Transp. & Rigging, Inc.*, 286 F.3d 1233, 1248 (11th Cir. 2002).

Yet, Plaintiff claims there is "abundant circumstantial evidence" and "direct testimony" to establish Defendant approved the final ad and authorized faxing. (D.E. 75 at 14.) In support, Plaintiff attempts to rebut Caroline Abraham's frank testimony on her company's custom and practice—it would always send a second cover letter with a corrected ad and get an "ad okay" from the client—with conjecture by her as to what "very often" happened, but which is not shown here. (*See id.* at 12-13.) This is nothing more than speculation and cannot be considered to create a genuine issue of fact. Fed. R. Civ. P. 56(c)(2).[4]  Plaintiff bears the burden of proof and does not point to any admissible evidence of approval or authorization of fax advertising on behalf of defendant.

Indeed, Plaintiff recognizes an "absence of business records showing that the final ad design was…approved by Defendant" but turns a blind eye to Abraham's testimony as to the impact of this absence and her acknowledgment that "something [was] missing." (*Compare* D.E.

---

[4] The Court may only consider admissible evidence when ruling on a Motion for Summary Judgment. *See e.g., XL Ins. Amer., Inc. v. Ortiz*, 673 F. Supp. 2d 1331, 1343 (S.D. Fla. 2009)("Speculative testimony is not admissible in evidence, and therefore, More's testimony regarding events that occurred outside his presence is not adequate to create a factual dispute that precludes summary judgment.").

75 at 13 *with* D.E. 60-5, Abraham Dep., at 229:1-6.)  Abraham plainly testified:

> Q.   Am I right, Ms. Abraham that there were two essential steps for a client to give final approval for fax advertising to be done on its behalf by B2B, [and] one was to get a fax, a finalized fax ad back from the client in which the client had designated that there was – the fax was "ad okay," that was one of the steps, right?
>
> A.   Yes.

(Def.'s SOMF, ¶ 26, Abraham Dep. at 220:3-11.)  The "N Date," where B2B recorded this "final approval," is not shown in this case.  (D.E. 60-5, Abraham Dep., at 223:12-25.)  The "standard practice" included "send[ing] out corrective ads" with a second cover letter, but this protocol, here, is "missing."  (*Id.* at 228-229.)  Roberts asked B2B to "refax [him] changes" so he could "sign off," but B2B has no record of doing so.  (*Id.* at 224:1-17; *see also* D.E. 60-4, ¶ 14.)

Even when Abraham speculated that she could have "sent the first cover letter a second time… with the corrected ad," she testified she "***never did that***."  (D.E. 60-5 at 229:6-17)(emphasis added.)[5]  She "*always* made up a new cover letter saying 'here's your corrected ad;' "[she] never used the original letter again."  (*Id.* at 229:17-20)(emphasis added.)  Moreover, Roberts has provided sworn testimony that he requested a revised and finalized ad be "refaxed" to him for a final okay, but no such document was provided.  (Def.'s SOMF, ¶ 29.)

By misconstruing the actual testimony, Plaintiff attempts to manufacture facts: "Ms. Abraham sent the finalized ad in completed form *as directed by Mike Roberts*;" "Defendant approved the final ad, *probably done* through a phone call from Roberts [who has provided a

---

[5] Plaintiff claims Abraham did not need to follow her regular custom and practice with Roberts because "the 'first' approval letter contained [the] instruction" of writing "Ad OK" or because "Abraham…may have sent the first letter to Mr. Roberts twice" to get approval.  (*See e.g.,* Pl.'s Resps. to Def.'s SOMF, ¶¶ 25-26.)  However, the first cover letter explained if changes needed to be made to an advertisement, which is what happened here, a client was to fax the modified advertisement back.  (D.E. 60-6 at 20.)  Only if "the selected ad *already* [met] with [a client's] approval," would a client know what to do.  (*Id.*)  This first cover letter made clear that "[o]nly after you approve your fax ad, will we send it where it is most apt to bring you new customers." (*Id.*)  Abraham testified she "never" would send this first cover letter twice, as plaintiff contends.

7

sworn statement] to Bedford [who has provided no testimony];" and, "B2B would not have gone ahead and conducted the fax broadcast without knowing if the customer was okay with it." (*See* Pl.'s SOAF, ¶¶ 5-6)(emphasis added.)  But, when reviewing the evidence, none of these are valid facts or contentions.  Instead, B2B's "standard practice" was not followed here; that cannot be disputed.  B2B always sent a second cover letter regarding the final approval and nothing in B2B's business records shows that was done.  Moreover, Mike Roberts, the only other fact witness on this issue, has confirmed that this did not happen.

Finally, Plaintiff's argument that *Defendant* sent "a check for $420.00" is simply contrary to the facts.  John G. Sarris D.D.S., P.A. never wrote any check to B2B.  (*See* D.E. 60-6 at 32.)

### 2. Plaintiff Points To No Evidence Of Apparent Agency Or Ratification.

Plaintiff makes the arguments that "[e]ven absent actual authority" a jury could find that Defendant is liable under theories of apparent authority or ratification.  (D.E. 75 at 15-17.) However, these arguments are illogical when applied to the facts of this case.

It is true, as Plaintiff contends, that under the theory of apparent authority, the question is whether "the third party 'appears to be acting in the ordinary course of the business confided in him.'" (D.E. 75 at 15-16.)  Apparent authority arises when the principal allows or causes others to believe that an individual has authority to conduct the act in question, inducing their detrimental reliance.  *Nat'l Auto Lenders, Inc. v. SysLOCATE, Inc.*, 686 F. Supp. 2d 1318, 1322 (S.D. Fla. 2010) *aff'd*, 433 F. App'x 842 (11th Cir. 2011), citing *Borg-Warner Leasing v. Doyle Elec. Co., Inc.*, 733 F.2d 833, 836 (11th Cir. 1984).

But apparent authority does not apply unless *the plaintiff* had a reasonable basis for believing that an agent acted with the principal's authority.  Restatement (Third of Agency) § 2.03(f) (2006)(emphasis added).  Moreover, "[a]pparent authority is not present when a third

8

party [a plaintiff] believes that an interaction is with an actor [a defendant] who is a principal." *See* Restatement (Third) Of Agency § 2.03(f) (2006)(emphasis added).

Plaintiff attempts to turn this analysis on its head by claiming it can proceed on such a theory given *what Defendant* allegedly did.  (*See* D.E. 75 at 16.)  However, the question is whether *Palm Beach* reasonably believed that B2B was involved and acting with apparent authority.  There is no evidence of this.  Instead, Plaintiff alleged that Sarris—and not any apparent agent—sent it an unsolicited fax.  (Def.'s SOMF, ¶ 4.)  Plaintiff's representative testified that he believed he was receiving a fax from Sarris—not any third-party contractor such as B2B.  (*Id.*, ¶ 36.)  There is no evidence Palm Beach believed it had any "interaction" with an apparent agent as opposed to defendant, the alleged principal.  Thus, apparent authority cannot be shown.  *See* Restatement (Third) Of Agency §2.03(f) (2006)(emphasis added).

Plaintiff also makes the meritless claim that there is evidence of Defendant ratifying the unauthorized acts of B2B, such that Defendant is liable.  (*See* Pl.'s Resp. at 16-17.)  However, ratification is *not* shown unless Palm Beach can demonstrate that Sarris had full, actual knowledge of the facts of the alleged, illegal fax transmission to Palm Beach.  *See NMS Indus., Inc. v. Premium Corp. of Am.*, 451 F.2d 542, 544 (5th Cir. 1971).  Ratification is not present in a case unless a principal *with knowledge* of the material facts regarding an unauthorized transaction takes a position inconsistent with an intention to repudiate the unauthorized act.  *See McDonald v. Hamilton Elec., Inc. of Florida*, 666 F.2d 509, 514 (11th Cir. 1982).

Plaintiff claims that "Defendant ratified the faxing when it learned about the faxing afterward and did not object or repudiate the faxing."  (D.E. 75 at 17.)  However, paradoxically, in support of this claim, Plaintiff cites to the letter written by Mike Roberts to B2B asking that the company contact Defendant's attorney "ASAP."  (D.E. 60-6 at 27.)  Far from a "fail[ure] to

9

raise any objection or repudiate the sending of the faxes," this letter serves exactly as an objection to what B2B had done. Moreover, this came only after Roberts instructed B2B to send the finalized ad back to him, which the company did not do, and when B2B proceeded without final authority from Roberts. (Def.'s SOMF, ¶¶ 23, 26, 28-29.) There was simply no action done on behalf of defendant for it to expressly or impliedly ratify—Roberts requested a final authorization and was never provided the opportunity to supply it. (*Id.*, ¶ 29.) Sarris is entitled to summary judgment on Count I.

### C. Sarris Is Entitled To Summary Judgment On The Conversion Claim.

Plaintiff claims that summary judgment on the conversion claim is inappropriate as the Fourth District Court of Florida has found, in a case of a confidential patient list held by a doctor, conversion was appropriate even though the property converted were "pieces of paper." (D.E. 75 at 18.) *Warshall v. Price*, 629 So. 2d 903, 905 (Fla. 4th DCA 1993), looked to similar case precedent to consider whether conversion applies when a plaintiff is "denied the benefit of his confidential patient list." For its part, Defendant has cited cases specifically arising out of alleged transmissions of fax advertisements, where the courts have ruled that such an action cannot be maintained as a conversion claim. (*See* D.E. 61 at 14-16.)

Here, there has been no conversion as Palm Beach does not have any fax advertisement purportedly received—any evidence of actual conversion—and Defendant never okayed the sending of any advertisement that would have purportedly converted property. Moreover, the case law factually on point shows summary judgment is proper.

**WHEREFORE**, Defendant, John G Sarris D.D.S, P.A., respectfully requests that this Honorable Court grant summary judgment, with prejudice, in its favor and against the Plaintiff on the Second Amended Complaint and grant such other relief deemed necessary and just.

Respectfully submitted,

LANE, REESE, SUMMERS, ENNIS & PERDOMO, P.A.

By: s/ Kevin D. Franz

William S. Reese, Esq.
Florida Bar No. 187183
wreese@lanereese.com
Kevin D. Franz, Esq.
Florida Bar No. 015243
kfranz@lanereese.com
2600 Douglas Road
Douglas Centre, Suite 304
Coral Gables, FL 33134
Phone: (305) 444-4418
Fax:     (305) 444-5504
*Attorneys for Defendant*

*Admitted Pro Hac Vice:*
Eric L. Samore ARDC # 6181345
esamore@salawus.com
Molly A. Arranz ARDC # 6281122
marranz@salawus.com
SMITHAMUNDSEN LLC
150 N. Michigan Avenue, Suite 3300
Chicago, Illinois 60601
Tel: (312) 894-3200
Fax: (312) 894-3210

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via the Court's CM/ECF online filing system and was served on all counsel of record via the Court's CM/ECF system on this the 22nd day of July, 2013.

>LANE, REESE, SUMMERS, ENNIS & PERDOMO, P.A.
>
>By: /s/ Kevin D. Franz
>William S. Reese, Esq.
>Florida Bar No. 187183
>wreese@lanereese.com
>Kevin D. Franz, Esq.
>Florida Bar No. 015243
>kfranz@lanereese.com
>2600 Douglas Road
>Douglas Centre, Suite 304
>Coral Gables, FL 33134
>Phone: (305) 444-4418
>Fax:    (305) 444-5504
>*Attorneys for Defendant*